**No. 23-40137**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

Diamond Services Corporation,

Plaintiff - Appellant

v.

RLB Contracting, Incorporated; Harbor Dredging, Incorporated; Travelers
Casualty and Surety Company of America,

Defendants - Appellees

---

**On Appeal from**
United States District Court for the Southern District of Texas
3:21-CV-253

---

**BRIEF OF APPELLANT DIAMOND SERVICES CORPORATION**

---

SUBMITTED BY:

Harry E. Morse
Martin S. Bohman
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Harbor Dredging, Incorporated | Christopher Solop of Biggs, Ingram & Solop, P.L.L.C. Jackson, MS |
| RLB Contracting, Incorporated | Mark Guthrie, Cody Schneider, and John Woolridge of Winstead, P.C. Dallas, TX |
| Travelers Casualty and Surety Company of America | Elliot Scharfenberg and Jane Daily of Guidry & Guidry Saint Martinville, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| Diamond Services Corporation | Harry Morse and Martin Bohman of Bohman Morse, L.L.C. New Orleans, LA |

S/Harry E. Morse
Attorney of record for Diamond
Services Corporation

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Diamond Services Corporation requests oral argument to assist the Court with complicated facts and an extensive record.

# TABLE OF CONTENTS

Contents                                                                                    Pages(s)

Certificate of Interested Persons ................................................................. ii

Statement Regarding Oral Argument ...................................................... iii

Table of Contents ....................................................................................iv

Table of Authorities ................................................................................vi

Jurisdictional Statement ...........................................................................1

Statement of the Issues.............................................................................1

Statement of the Case...............................................................................2

Summary of the Argument........................................................................9

Standard of Review ................................................................................11

Argument.................................................................................................12

   1.  Diamond should be compensated for its delay................................12

      a.  Diamond presented overwhelming evidence of the cost of its delay.......12

      b.  Diamond's evidence constitutes a valid claim in quantum meruit
         under Texas law......................................................................14

      c.  Diamond's proof of claim is not Diamond's
         damages for delay....................................................................20

         A. The district court would require Diamond to produce evidence
           to rebut unmade arguments ...............................................21

         B. RLB did not follow its own would-be damages model ....................22

2. Diamond is entitled to recover for the tug KERRILYNN................................24

3. Diamond is entitled to recover under Travelers as surety................................25

   a. The Miller Act instructs courts to look past the number of contracts, to the actual relationship of the parties. Diamond, for Miller Act purposes, was a subcontractor of RLB ....................................................................................26

   b. Diamond gave notice to RLB and to Travelers within 90 days of the end of work. ........................................................................................27

Conclusion .........................................................................................................28

Certificate of Service .........................................................................................29

Certificate of Compliance ..................................................................................30

# TABLE OF AUTHORITIES

Cases……………………………………………………………Pages(s)

*Air Conditioning, Inc. v. L. E. Travis & Sons, Inc.*
    578 S.W.2d 554, 556 (Tex. App. 1979) ....................................................18

*Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*
    271 F.3d 624 (5th Cir. 2001) ........................................................12

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)................................................................ 11-12

*Anderson v. U.S. Dept. of Housing and Urban Dev.*
    554 F.3d 525, 529 (5th Cir. 2018) ...................................................27

*Brender v. Sanders Plumbing*
    No. 02-05-067-CV (Tex. App. Jul. 20, 2006) ............................................17

*City of Houston v. RF Ball Const. Co.*
    570 S.W. 2d 75, 77 (Tex. App. 1978) ................................................. 19-20

*Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*
    615 F.3d 599 (5th Cir. 2010) .......................................................11

*Elec. Wire & Cable Co. v. Ray*
    456 S.W.2d 260 (Tex. App. 1970) ............................................................16

*FD Rich Co. v. United States ex rel. Industrial Lumber Co.*
    417 U.S. 116, 123 - 24 (1974) ......................................................26

*HE Butt Grocery Co. v. Rencare, Ltd*
    2004 WL 199272 (Tex. App. Feb. 4, 2004) ..............................................16

*Hill v. Shamoun & Norman, LLP*
    544 S.W.3d 724 (Tex. 2018) ...................................................... 14-15, 17

*Kelly v. Tracy*
No. 01-18-913-CV, 2022 WL 2837335 (Tex. App. 2022) .................... 16-17

*Little v. Liquid Air Corp*
37 F.3d 1069 (5th Cir. 1994) ........................................................21

*Miller v. Light*
538 S.W.2d 487 (Tex. App. 1976) ...............................................16

*M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.*
731 S.W.2d 620 (Tex. App. 1987) ...............................................12

*Millgard Corp. v. McKee/Mays*
49 F.3d 1070 (5th Cir. 1995) ......................................................20

*Montclair Corp. v. Earl N. Lightfoot Paving Co., Inc.*
417 S.W.2d 820 (Tex. App. 1967) ...............................................16

*PYCA Industries v. Harrison County*
177 F.3d 351, 362 (5th Cir. 1999) ...............................................20

*TIG Ins. Co. v. Sedgwick James of Wash.*
276 F.3d 754 (5th Cir.2002) .......................................................12

*United States ex rel. E & H Steel Corp. v. C. Pyramid Enter's, Inc.*
509 F.3d 184 (3d Cir. 2007) ........................................................26

*United States ex rel. Liberty Mechanical Serv's v. NASIC*
2 F.Supp.3d 610 (E.D. Pa. 2014) ................................................27

*Walker & Associates Surveying, Inc. v. Roberts*
306 S.W.3d 839 (Tex. App. 2010) ...............................................15

*Willis v. Roche Biomedical Labs., Inc.*
61 F.3d 313 (5th Cir.1995). ........................................................12

**Statutes and Treatises**                                              **Pages**

64 TEX. JUR.3d *Restitution Etc.* § 34 (2009) .......................................16

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. 1292(a)(3).

## STATEMENT OF THE ISSUES

The following issues are presented for review:

1. Whether the district court correctly ruled that Diamond Services has no claim under quasi-contract against RLB and Harbor as a consequence of a delay in a dredging project when the Corps of Engineers paid, globally, in excess of $6,000,000 for that delay, that delay affected Diamond, and Diamond worked in reliance of RLB's agreement to compensate Diamond out of the payment from the Corps.

2. Whether the district court correctly dismissed Diamond's claim for the tug KERRILYNN when the contract is silent as to the cost for tugs, and RLB was paid by the Corps for the tug KERRILYNN.

3. Whether the district court correctly dismissed Diamond's claim against Travelers under the Miller Act on the basis that Diamond was not in privity of contract with RLB, and that Diamond did not specifically plead that it had given Travelers requisite notice within ninety days of the end of work.

1

## STATEMENT OF THE CASE

RLB won a contract with the Army Corps of Engineers to dredge a portion of the Houston Ship Channel. Although RLB was awarded the contract, RLB didn't do the dredging: it contracted with Harbor Dredging to do the dredging. ROA.128-130. Harbor didn't do the dredging either. Harbor entered into a contract with Diamond Services Corporation to do the dredging, and Diamond actually did the dredging on the job. ROA.28-30. RLB, for its part, was in charge of offloading the dredge spoil from barges. The contract between RLB and Harbor, and between Harbor and Diamond, are identical, except Harbor took a small portion of the sum for its role in bringing Diamond to the job.[1] RLB's contract with the Corps paid $12 per cubic yard of material dredged. Of that, Diamond got $6.50 per yard, RLB got $5.50 per yard, and Harbor got $.50 per yard. ROA.1884 at fn. 3.

Soon enough, an unforeseen problem with the job arose: there were excessive tires in the dredge spoil. Tires slow the dredging, and tires slow pumping off the dredge spoil too. Everyone suffered as a consequence. ROA.1490-92. There is a process by which the adversely affected parties can be compensated for an unanticipated delay: a request for equitable adjustment, where the contractor submits to the Corps – on behalf of itself, and everyone else on the job – how much it was

---

[1] Compare ROA.28-30 (Harbor/Diamond) with ROA.128-130 (RLB/Harbor).

adversely affected, and the Corps compensates not just the contractor but everyone for that delay. ROA.1567. That is what happened here.

But before anyone submitted an REA to the Corps, the parties adversely affected by the tires – Diamond, Harbor, and RLB – met to discuss the issue. Diamond told RLB that it was losing money on the job and it could not afford to keep working. ROA.1484-85. Diamond asked RLB to pay it a downtime rate when the Diamond dredge was not working. RLB did not agree to pay a downtime rate, but implored Diamond not to leave the job. Instead, RLB, through its principal, told Diamond, through its principal, that RLB would compensate Diamond out of the request for equitable adjustment. ROA.1484-85. RLB did not tell Diamond how much it would compensate Diamond, nor on what metric, but nonetheless, RLB said it would compensate Diamond. ROA.1484-85.

At that meeting, RLB wanted something from Diamond, too. RLB was going to submit the request for equitable adjustment on a measured mile analysis. ROA.1485. The measured mile analysis takes a timeframe where the parties are not delayed and measures how much they dredged. Then, the parties compare that rate to the other time periods, and it assumes that the slower rate in the other time periods is caused by the unforeseen site condition and should be compensated. By way of example, if the parties dredged 5,000 yards over one ten-day period, then 10,000 yards over a ten-day measured mile window, the measured mile analysis assumes

slower ten days occurred at half the rate because of the unforeseen circumstance, and compensates the dredger accordingly.[2] Therefore, RLB had an ask of Diamond: RLB wanted Diamond to increase its production for the measured mile time window, beginning to work twenty-four hours a day. ROA.1359. Under the contract, Diamond was not required to work twenty-four hours a day. ROA.28-30.

To RLB, increasing Diamond's work rate to twenty-four hours had two salutary effects. First, it would increase the measured mile recovery. Second, RLB's contract with the Corps stipulated a time for completion and liquidated damages if RLB did not finish timely. By the time Diamond was brought out to the job, RLB was close to being liable to the Corps for liquidated damages. ROA.1569. By speeding production, Diamond decreased RLB's exposure to liquidated damages.

A few months after the parties' meeting, RLB submitted one REA to the Corps. ROA.1380-84. RLB did not include Diamond in preparing the submittal, and as a consequence, Diamond only found out about the REA after it had been submitted (and rejected). But when Diamond found out about the REA, it was aghast: the REA seemingly would give the profound majority the money to RLB, not to Diamond.. ROA.1385-86. Diamond made this clear in correspondence to RLB, and Diamond said it anticipated being compensated about half of any REA. ROA.1386.

---

[2] ROA.1341-43 (Maturin); ROA.1498 (Boyd); ROA.1362 (Swiber).

RLB did not respond to Diamond at the time, but in the deposition of RLB's principal, Randy Boyd, he explained that there had been a misunderstanding: of course RLB would not take most of the money from the Corps. ROA.1368-70. Instead, RLB anticipated splitting those funds on the same basis as the underlying contract: $6.50 of every $12 would go to Diamond, $.50 of every $12 to Harbor, and $5.50 of every $12 to RLB. ROA.1368-70.

That REA wasn't paid: the Corps, Diamond was told, only wanted one REA at the end of the job. Then, at the end of the job, RLB requested a form from Diamond, which Diamond filled out and submitted to Harbor. ROA.132-34. Harbor took Diamond's form and marked it up – Harbor claimed to have incurred 20.19% overhead on Diamond's submittal, and 9% profit on Diamond's submittal. ROA.136. Harbor's claimed direct costs to the Corps were $64,371, but by adding overhead and profit, Harbor told RLB that Harbor's expenses were really in excess of $700,000. 90% of Harbor's claim to RLB for the equitable adjustment is in claiming overhead and profit on Diamond's costs. ROA.136. When Harbor's principal was asked why Harbor was charging mark-up on Diamond's proof of claim, he had a ready answer: he was charging for insurance on dredges. Harbor didn't have any dredges on the job. ROA.1348-51.

RLB separately marked up Harbor's mark-up on the REA, charging 33.7% overhead on Harbor's inflated claim, and 9% profit on Harbor's inflated claim, to

bring a total request in the REA for just under $9,000,000, and 148 additional days to avoid liquidated damages. ROA.143.

None of this was known to Diamond. Despite Diamond's repeated requests to be a part of the REA process, Diamond was instead frozen-out. ROA.1436.[3] Diamond had repeatedly communicated to RLB, in writing, that Diamond anticipated receiving more than half the REA, because Diamond did more than half the work. ROA.1387;[4] ROA.1436.[5] Then, later, RLB reduced its claim and settled with the Corps for $6,310,636.00. ROA.1440.

Both RLB's principal and Harbor's principal acknowledged that the REA must be split among Diamond, Harbor, and RLB. ROA.1493-97. Harbor's principal, Roland Maturin, testified that he did not know how that REA should be split.. ROA.1344-46; ROA.1352. It was ordinary practice, as a prime contractor and as a subcontractor, to involve everyone on the job in coming up with the form for an REA, and to discuss how that REA should be split before-the-fact. ROA.1347-48. But that didn't happen with this job. Mr. Maturin did not say that he anticipated

---

[3] Diamond made this clear at the time: on May 5, 2021, Diamond wrote "Despite multiple request, including my December correspondence, RLB has not involved Diamond in the creation of, or the process of, or the results of any presentations RLB has made to the Corps regarding any contractual deviations."

[4] In correspondence dated April 29, 2021 Diamond stated "Diamond is entitled to 56.65% of any relief or claim settlement RLB receives from the Corps as its pro rata share of the per-yard price in the dredging contract."

[5] In correspondence dated May 5, 2021, Diamond provided "Diamond remains entitled to 56.65% of any relief or claim settlement RLB received from the Corps, as its proportionate share of the per-yard price in the dredging contract."

getting what he submitted as his certified costs, or that he anticipated getting some percentage of it: he said that he trusted Mr. Boyd would do right by him, because the two had a longstanding relationship. ROA.1348. Mr. Maturin specifically said that he could not determine what the parties should recover from the REA. ROA.1345-46.

Mr. Boyd, too, said that he did not know how to split the REA. ROA.1501. When he was asked about the first, unsuccessful REA, Diamond asked Mr. Boyd how he anticipated splitting it up: his answer was equivocal. He said that probably, he anticipated splitting it up on the same percentage as the underlying contract – Diamond would get over half. ROA.1499-1501. When he was asked about another way, he could not think of any other way to split up the REA. ROA.1501.

Mr. Boyd did not think that the same result should follow for the second REA, which is why, presumably, he did not pay the second REA on the basis of the underlying contractual split. ROA.1512-15. But his explanation was different from RLB's posture in litigation, and different from the district court's rationale too. Mr. Boyd said that the FARs – Federal Acquisition Regulations – mandated that Diamond only get $950,000. ROA.1513-15. Diamond has searched the FARs in depth, but has not found anything so mandating. And the actual payment, submitted by the Corps, makes no such indication. The REA submits that the payment is for RLB and its contractors, without explaining how much goes where: it provides that

the payment is made "in full on behalf of the contractor, and its subcontractors and suppliers, for all costs and markups [ . . .]" ROA.1567.

Separately, before RLB negotiated down the REA with the Corps, one of Diamond's employees, Jim Furlette, received a call from Harbor's principal, Mr. Maturin. Mr. Maturin asked Mr. Furlette if Diamond would accept $950,000 in full and final settlement. Diamond's response was conditional: Diamond wanted to know what the Corps was willing to pay. If the Corps was only paying $950,000, then Diamond would take $950,000. ROA.1451-52. Diamond made this patent, in correspondence to RLB: Diamond wanted to be a part of the REA process, and Diamond would not settle without knowing what the Corps was paying. ROA.1387; ROA.1436.

In the face of this correspondence, knowing full well that Diamond did not consent, RLB settled with the Corps. RLB also negotiated down the number of liquidated-damages days that it faced from the Corps, which it had incurred by its delay in starting the project in the first place but reduced through Diamond's diligent work. ROA.1569.[6]

Diamond filed suit against RLB, not yet knowing what RLB had recovered for the REA. RLB then unconditionally tendered $950,000 to Diamond. ROA.221-

---

[6] "Your required contract completion date is April 5, 2020. I must remind you that late completion on this contract will result in liquidated damages being assessed in the amount of $3,527.00 for each day." Diamond's contract was signed March 3, 2020. ROA.30.

22. RLB moved to dismiss Diamond's lawsuit, and its motion to dismiss was granted in part. The district court ruled that Diamond's contractual claim failed, but that Diamond had a claim in quasi-contract. RLB later moved for summary judgment, as did Harbor. Though the motions occurred after the close of discovery, the district court had not ruled on the motions to dismiss. RLB asserted a number of theories. Relevant to this appeal, RLB asserted that Diamond was limited to what it showed in its worksheet that made up a part of the REA. The district court granted RLB's and Harbor's motions for summary judgment on different grounds: it found Diamond could not prove damages. This appeal timely followed.

## SUMMARY OF THE ARGUMENT

Diamond did more than half the work on the Houston Ship Channel dredging job. Diamond was just as delayed as anyone else by the tires on the job. RLB submitted costs, including costs for Diamond, to the Army Corps of Engineers for the job. RLB was compensated for the delay – more than $6,000,000. RLB cannot, under a quasi-contract theory, keep the money that it submitted for Diamond and received for Diamond.

The parties could have contracted differently: the parties could have contracted so Diamond would not be compensated for delay. They could have contracted so Diamond would be paid a standby rate for delay. They did not. RLB told Diamond it would compensate Diamond out of the REA. Diamond, in reliance,

worked as directed by RLB, telling RLB all the while that Diamond anticipated being compensated with about half the REA.

The district court dismissed Diamond's quasi-contractual claim, finding that Diamond had not produced evidence demonstrating the reasonable value of the work performed. This conclusion is legally wrong because Diamond proved its damages. Diamond is entitled to payment on the same ratio as the underlying work. Under Texas law, the measure of damages for quantum meruit is the reasonable value of the work performed – or here, the reasonable cost of the delay. Harbor and RLB's principals both acknowledged Diamond is owed for the delay. The only sensible compensable basis is what RLB's principal indicated: Diamond should get a little over half the REA because Diamond did a little over half the work and Diamond was compensated a little over half the price-per-yard on the contract. The answer endorsed by the district court would allow RLB to keep about $4,750,000, and would compensate RLB for the cost of delay owed to Diamond due to a differing site condition. RLB cannot equitably keep the money paid to RLB by the Corps for Diamond's work.

Separately, Diamond brought a tug to the job. Diamond needed a second tug to move the M/V KERRILYNN. RLB agreed to pay for half of the tug. The district court denied Diamond's claim for recovery of the KERRILYNN on the basis that Diamond agreed to transport the barges. This is true. But the KERRILYNN was not

there to transport barges on the job; it was there to move the dredge, which is not referenced under the initial agreement. Furthermore, RLB submitted the costs for the KERRILYNN to the Corps, and the Corps paid the KERRILYNN. RLB cannot equitably keep money for the KERRILYNN that it did not spend on the KERRILYNN.

Finally, Diamond has a valid claim against Travelers. For purposes of the Miller Act, courts look at the total picture to see whether someone is a subcontractor or a sub-subcontractor. Rather than analyze this case law, the district court dismissed Diamond's claim on the basis that RLB is entitled to use Harbor as a cut-out to avoid Miller Act liability. But even if Diamond were a sub-subcontractor rather than a contractor, Diamond still has a Miller Act claim because it gave notice to RLB and RLB's surety – repeatedly, in writing – that it was asserting a claim before RLB even settled with the Corps.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo*, applying the same standard applied by the district court. *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 605 (5th Cir. 2010). The district court must grant summary judgment if the pleadings, discovery and disclosure materials on file, as applicable law, may alter the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001).

A dispute is genuine when a reasonable finder of fact could resolve the issue in favor of either party, based on the evidence before it. *Anderson*, 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir.2002). If the party moving for summary judgment demonstrates the absence of a genuine issue of material fact "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir.1995).

## ARGUMENT

### 1. Diamond should be compensated for its delay.

#### a. Diamond produced overwhelming evidence of the cost of its delay.

The district court ruled that Diamond did not have damages. It ruled that "Diamond must introduce evidence as to the reasonable value of the work it performed or the materials it furnished. Diamond has not done so." (citing *M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 624-25 (Tex. Asp. 1987). The district court ruled that therefore, Diamond cannot recover against Harbor, against, RLB, or against Travelers.

12

The REA compensates the parties for their delay, and Diamond introduced evidence of Diamond's delay: 54.16%, on the same ratio of the contract price. Evidence for this in the record is thorough – nearly overwhelming. The first comes from the testimony of RLB's principal, Randy Boyd, in multiple regards. Mr. Boyd testified that when a contractor receives an REA, it owes others on the job their fair share of that REA. Mr. Boyd was then asked how that should be determined. He explained that he expected to split the first (unpaid) REA on the same basis as the contract price – Diamond should get $6.50 of every $12. When pressed, he said there might be another way to split the REA, but he didn't know what that might be. This follows, as the delay affected everyone the same amount, as Mr. Boyd admitted. With the possible exception of mobilization and demobilization – neither of which would reasonably be delayed by the existence of tires on the job site – the tires had the same effect on everyone.

Further evidence that Diamond's detriment from downtime was a little over half the total comes from the underlying contract, and its split, giving $6.50 of every $12 to Diamond. More evidence still comes from Diamond's correspondence to RLB, written as the job was ongoing and before the REA was negotiated, telling RLB that Diamond anticipated recovering just over half the REA.

Additional evidence comes from the testimony of Roland Maturin, Harbor's principal. Mr. Maturin said he did not know how the REA should be split. If the total

REA were $1,000,000, he did not know what Diamond's share should be, but he admitted that Diamond was owed out of the REA. Mr. Maturin professed that he trusted RLB to treat him right. Despite all this evidence, the district court ruled on summary judgment that Diamond could not substantiate its claim to damages.

>    b.  *Diamond's evidence constitutes a valid claim in quantum meruit under Texas law.*

Texas courts have routinely approved quantum meruit damages claims on similar facts, where there are no specific invoices marked "delay" or "work done," but plainly a recovery is appropriate. Oral testimony has long been appropriate to establish damages in a quantum meruit claim. The closest case, which is dispositive here, is *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d. 724 (Tex. 2018). There, the plaintiffs were plaintiff lawyers and they had a contingency fee agreement for their clients, but they performed further work, outside the scope of that engagement. They sought compensation for that additional work. The jury awarded quantum meruit damages on the basis of what the contingency fee would have been. The Texas Supreme Court reversed with regard to the amount of damages – it held that allowing recovery on a contingency basis without a signed contingency agreement would circumvent the statute of frauds – but it set a new trial on the measure of damages, holding that the lawyers could recover damages on quantum meruit. *Id.* at 743.

The Texas Supreme Court explained what factors the trial court should review in setting damages: "all equitable considerations (such as whether the defendant has

been unjustly enriched, the plaintiff would be unjustly penalized if the defendant retained the benefits [ . . . ] and the plaintiff has unclean hands." *Id.* at 742. Crucially, the Supreme Court held that the trial court had abused its discretion by failing to award the plaintiff any damages, because "there was legally sufficient evidence that S & N (the firm) performed global settlement services for Hill (the client) and that Hill was aware [the firm] expected to be paid for those services. To hold otherwise would allow Hill to be unjustly enriched despite the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Id.* The Texas Supreme Court remanded for a new trial to set damages.

Here, just as in *Hill*, we know one party received a fixed monetary award. Both parties expected to split that award. There, as here, it would allow one party to be unjustly enriched if one party could keep all the money that it sought and obtained for another. Unlike *Hill*, there is nothing that would violate the statue of frauds by awarding Diamond a percentage: that is how the underlying contract worked, and both parties were equally affected by the downtime.

Likewise, in *Walker & Associates Surveying, Inc. v. Roberts*, 306 S.W.3d 839 (Tex. App. 2010), there was a challenge – at trial, not on summary judgment – to proof of damages on a quantum meruit claim. The Court first cited the ordinary description of damages for quantum meruit: "the reasonable value of the work performed," and then it described how to find that reasonable value: "[w]hat

constitutes reasonable compensation for benefits furnished does not depend on any single factor, but takes into account all the evidence and circumstances." *Id.* at 859, citing 64 TEX. JUR.3d *Restitution Etc.* § 34 (2009).

These cases hardly stand alone. In *HE Butt Grocery Co. v. Rencare, Ltd.*, 2004 WL 199272 (Tex. App. Feb. 4, 2004), the appellate court found a quantum meruit award on the basis of a $400 per diem, instead of the invoiced amount, as fair and reasonable. Additionally, in *Elec. Wire & Cable Co. v. Ray*, 456 S.W.2d 260, 263 (Tex. App. 1970), the defendant-appellant in a quantum meruit claim asserted there was no evidence of the value and materials charged. The appellate court disagreed. It affirmed the district court's award based on the plaintiffs' testimony at trial that the sum charged was a fair and reasonable price. The *Ray* court cited *Montclair Corp. v. Earl N. Lightfoot Paving Co., Inc.*, 417 S.W.2d 820 (Tex. App. 1967) with approval, and both found that the underlying contract was evidence of value. In *Miller v. Light*, 538 S.W.2d 487 (Tex. App. 1976), the Court held that oral testimony as to the fair value of labor and materials involved in extra work was adequate, even though the plaintiff was unable to provide bills or records of his costs for materials and labor.

So too *Kelly v. Tracy*, No. 01-18-913-CV, 2022 WL 2837335 (Tex. App. 2022). The parties reached a deal without negotiating a price. The trial court issued a directed verdict on the quantum meruit claims, and the appellate court reversed,

finding that evidence of what an insurance company paid for similar services; the contract price; and what the parties believed would be reasonable was adequate for a quantum meruit damages award. Collecting cases, the *Kelly* court endorsed a wide swath of evidence to support damages: evidence of what others received for like services; opinion of witnesses who are familiar with the value of such services; the opinion of the person performing the service; or possibly even the opinion of the person benefitting.[7]

Most of these cases, excepting *Hill*, are harder than Diamond's claim against RLB because most of those claims have an unknown variable: the total price for the whole project subject to the quantum meruit claim. Except *Hill*, these cases are more analogous to RLB bringing a quantum meruit claim against the Corps. Here, we know just what the total cost of the delay is: in excess of $6,000,000 that RLB received from the Corps. There is no risk that RLB would somehow end up short-changed – RLB, if Diamond proves its claim at trial, still gets to keep more than $3,000,000 for its delay. Diamond introduced not just the total price for the whole project, but the underlying contract, too, which shows the split for the project. And Randy Boyd's testimony – that he expected to split the REA on the same ratio – Roland Maturin's – that he didn't know how the funds should be split – and Stephen Swiber's – that he expected to receive the same ratio as the underlying contract. Not

---

[7] See also *Brender v. Sanders Plumbing*, No. 02-05-067-CV (Tex. App. Jul. 20, 2006).

only is there this testimony, and the payment from the Corps, which is sufficient on its own under the above case law, there is also the underlying contract that sets the ratio for the job, and there is testimony that the same delay affected everyone equally. Diamond has amply established a fact question with regard to proof of damages under quantum meruit.

The district court erred by looking instead solely for a contractual measure of damages – basically, invoices. But that is not the standard. Quantum meruit is, by definition, quasi-contractual. Accordingly, "[a] judgment predicated upon quantum meruit must be supported by evidence of the reasonable value of labor or services performed and materials furnished." *Air Conditioning, Inc. v. L. E. Travis & Sons, Inc.*, 578 S.W.2d 554, 556 (Tex. App. 1979). We know the reasonable value of the delay: $6,310,636. We know Diamond's share of the contract: 54%. We know that the delay affected everyone equally. The math is simple.

The district court separately and erroneously claims Diamond raised this claim – that Diamond is entitled to a little more than half of the total – for the first time in opposition to RLB's motion for summary judgment. In fact, this is in Diamond's complaint.[8] Much more significantly, it is in all of Diamond's correspondence to RLB, when Diamond first found out RLB was submitting an REA

---

[8] ROA.21 ("Diamond is entitled to no less than 54.16% of the equitable adjustment received by RLB")

to the Corps the first time, and before RLB settled with the Corps.[9] RLB knew Diamond was claiming about half the total REA because Diamond suffered a little more than half the cost of the delay before RLB submitted its REA to the Corps, and before RLB negotiated down its REA with the Corps.

The parties could have contracted differently. Diamond asked RLB for a standby rate. If RLB had agreed to pay Diamond a standby rate instead of compensating Diamond out of the REA, then Diamond could not be heard to complain that Diamond gets a share of the REA because, after-the-fact, that would have worked out better.

Though not referenced in the district court's ruling on motions for summary judgment, the district court had previously ruled that Diamond's contract with Harbor included a no-damages-for-delay clause. ROA.1664. Texas law provides that even in the face of a no-damages-for-delay clause, a subcontractor is still entitled to damages for delay if there is a circumstance unforeseen to the parties. See generally *City of Houston v. RF Ball Const. Co.*, 570 S.W. 2d 75, 77 (Tex. App. 1978). But in the interest of certainty, Diamond would make clear: there is no clause where Diamond waives its chance to seek damages for Diamond's delay.

---

[9] RLB accepted the REA on August 12, 2021. ROA.1440. RLB negotiated the REA on July 9, 2021. ROA.1439.

The district court cites articles two and four of the contract in its finding that there is a no-damages-for-delay clause. The closest the closest the contract comes to referencing delay is providing that time is of the essence. Time is of the essence means what it says: the parties must work purposefully. A no-damages-for-delay clause must specifically reference delay, and it must reference damages, and it must have some sort of negating word in there. Examples abound – see e.g. *RF Ball* ("The Contractor shall receive no compensation for delays or hindrances to the work"); *Millgard Corp. v. McKee/Mays*, 49 F.3d 1070 (5th Cir. 1995) (placing the risk of a change in the soil conditions on the contractor); *PYCA Industries v. Harrison County*, 177 F.3d 351, 362 (5th Cir. 1999) (finding a no-damages-for-delay clause is enforceable unless (a) the delay was not contemplated by the parties; (b) the delay was caused by bad faith or active inadvertence; or (c) the delay was tantamount to abandonment of the contract.) But this contract does not so provide. Especially in the absence of a no-damages-for-delay clause, Diamond's claim for delay should proceed.

### c. Diamond's proof of claim is not Diamond's damages for delay damages.

RLB's argument was notably different from what the district court held. RLB argued not that Diamond could not show damages, but that Diamond was limited to Diamond's submittal as part of the REA: that is, RLB argues that Diamond's damages model is wrong, not that Diamond doesn't have a damages.

     i.  The district court would require Diamond to produce evidence to <u>rebut unmade arguments.</u>

Shown below, RLB's analysis is wrong. But as a predicate matter, RLB's argument and the district court's holding are at odds. RLB argued that there is only one acceptable damages model: everyone takes according to their submission to the Corps. The district court held otherwise. Without endorsing RLB's conception of damages, the district court held that Diamond did not prove it had damages under any damages model. Though the district court is free to grant summary judgment on any grounds, even those not pled, its holding would require Diamond to present summary-judgment evidence to oppose an unmade argument, which Diamond is not required to do. See generally *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994), citing *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986). ("The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact. [. . .] If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.") (cleaned up).

If the district court had held that Diamond could not come forward with evidence for whatever reason, then Diamond presenting irrelevant evidence would be immaterial, and summary judgment would properly issue. Here though, the district court's holding would require Diamond to rebut an unmade factual argument. Diamond is not required to introduce facts that would rebut every potential grounds

for summary judgment, including those unmade by the parties. This is immaterial because Diamond has significant evidence of its damages, shown above. It bears noting that despite exhaustive research, Diamond has not found a case where a quantum meruit claim was dismissed for want of evidence of damages on remotely similar circumstances at the summary judgment stage.

### ii.  RLB did not follow its own would-be damages model.

RLB's argument – that Diamond is limited to the submittal it made as part of the REA – was rejected by both RLB's and Harbor's principals and by RLB's conduct. Mr. Boyd testified that he anticipated splitting the REA based on the total job cost. He said he was not able to do so because the FARs prevented him from doing so. (They don't, and RLB has not advanced the argument that the FARs have any role with regard to distribution of the REA.) Mr. Maturin said that he did not know how the REA should be split. Both Mr. Boyd and Mr. Maturin conceded that Diamond must get some amount from the REA. RLB, through counsel, told the district court that Diamond actually gets none of the REA, and the district court's opinion endorses this.

Explained above, Diamond submitted its certified job costs to Harbor and at the direction of Harbor. Harbor included, as a small fraction (about 8%) its own cost, then (about 92%) charged overhead and profit on Diamond's certified costs and submitted them to RLB. RLB charged overhead and profit on Harbor's overhead and

profit on Diamond's certified costs, and submitted them to the Corps. All-in, the combination of (a) Diamond's certified costs, (b) Harbor's claimed profit and overhead on Diamond's certified costs, and (c) RLB's claimed profit and overhead on Harbor's claimed profit and overhead on Diamond's certified costs are well over half the total claim. Then RLB negotiated a number with the Corps – really two numbers, one for liquidated damages days and one for the entire project – and then it sought to cut Diamond a check for $950,000, and Harbor a check for $500,000, and keep just under $5,000,000 for itself. The percentages on the contract, by comparison, were: 6.5/12ths to Diamond, .5/12ths to Harbor, and 5.5/12ths to RLB.

If RLB had settled claims on the basis of everyone's submittal to the Corps, then it would be easy to establish. In the REA, Diamond's worksheet summed to $2,362,344. Harbor's total costs summed to $64,371, but then, by assigning profit and overhead to Diamond's invoices, Harbor's claimed total costs became $816,825 – 35% of Diamond's total costs. If RLB were splitting the REA on the basis of the total claim submitted to the Corps, then RLB would have given Harbor 35% of what RLB gave Diamond. Instead, RLB gave Harbor about 53% of what RLB sought to give Diamond: $500,000 to Harbor and $950,000 to Diamond. For its part, RLB kept about 500% of what it thought Diamond had incurred because of the delay: in excess of $4,550,000 versus $950,000. Before RLB could hope to establish that Diamond's submittal as part of the REA is the cap on Diamond's claim, RLB would have to

23

explain why its own principal is wrong; why Harbor's principal is wrong, and why RLB did not make its own calculations on that basis.

### 2. Diamond is entitled to recover for the tug KERRILYNN.

Diamond bid the job on the basis of using one tug, but once Diamond got to the job, it became apparent that Diamond required a second tug. ROA.1357. So Diamond contracted to bring the KERRILYNN to the job. RLB agreed to split the cost with Diamond. ROA.1363

In Diamond's contract with Harbor, Diamond agreed that Diamond is responsible for moving the barges from the excavation site to the unloading site. ROA.28, Article 2 ("Subcontractor will be responsible for traversing the hopper barges from excavation site to the unloading site.") When Diamond arrived, it became apparent that a second tug was necessary not to move the barges, but to move the dredge in and out of the Houston Ship Channel for passing traffic. ROA.1357. That is the context in which Diamond, through Harbor, agreed to split the cost of the KERRILYNN with RLB. Diamond, through its principal, confirmed as much in a text message to Harbor's principal, which he acknowledged. ROA.1363.

The district court held that because Diamond was responsible for the tug, Diamond could not recover for the KERRILYNN. The district court's reasoning is flawed, and should be reversed, for two reasons.

24

First, Diamond did not agree to provide tugs for the job. Diamond agreed to move the hopper barges from the excavation site to the unloading site. ROA.28. Moving the dredge is a different matter, and beyond the scope of the contract. Therefore, the contract does not control and RLB's agreement to pay for half the tug is binding.

Second, RLB included the KERRILYNN on its claim to the Corps. ROA.175. The Corps paid for the KERRILYNN, although we do not know precisely how much of the KERRILYNN the Corps paid for. When he was asked, Mr. Boyd acknowledged that he had money from the Corps for the KERRILYNN in his bank account, but he did not know how much because he did not segregate it. ROA.1379. Diamond incurred the expense of the KERRILYNN. RLB cannot keep money for the cost of the KERRILYNN that RLB did not incur.

### 3. Diamond is entitled to recover against Travelers as surety.

The district court principally reasoned that if Diamond cannot prove damages, its Miller Act claim must fail. If Diamond had not established damages, then this would logically follow. But because Diamond has established its damages, Diamond will address the second basis for the district court's dismissal of Diamond's Miller Act claims: that Diamond was a sub-subcontractor, and that even though Diamond gave notice to RLB and Travelers repeatedly within ninety days of the end of work,

Diamond did not include in its complaint that it had given notice within ninety days, so its claim fails. Diamond will address both.

>    a.   *The Miller Act instructs courts to look past the number of contracts, to the actual relationship of the parties. Diamond, for Miller Act purposes, was a subcontractor of RLB.*

Diamond's and Harbor's contracts are identical in the great majority of regards. Tellingly, they are identical in scope-of-work: there is nothing in the contract for Harbor to do. Under half a century of Miller Act caselaw, this makes Diamond RLB's subcontractor, not Harbor's. *FD Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 123 - 24 (1974). As Diamond explained, the test for whether a company is a subcontractor under the Miller Act is not counting contracts like rungs on a ladder, it is "the substantiality and importance of his relationship with the prime contractor." *Id*; see also *United States ex rel. E & H Steel Corp. v. C. Pyramid Enter's, Inc.*, 509 F.3d 184 (3d Cir. 2007). On Travelers' motion to dismiss, the district court ruled that it would not set aside the parties' chosen method of contracting: Diamond was a sub-subcontractor, not a subcontractor. Furthermore, though the district court made this ruling on a motion to dismiss, before that order was filed, Mr. Maturin testified that Diamond was RLB's contractor. ROA.1325.

      *b. Diamond gave notice to RLB and to Travelers within 90 days of the end of work.*

If Diamond is a sub-subcontractor, it must give notice not 365 days from the last date of work, but 90 days. If Diamond gave notice to RLB within ninety days, then Diamond, as a sub-subcontractor, complied with the Miller Act, and Diamond's claim should stand. Diamond did. The last date of work on the job was around February 19, 2021. ROA.147 (showing Diamond's last payroll expenses as 2/21/2021). Diamond's submittal to RLB made part of the REA was dated March 30, 2021. ROA.132. Diamond, in April and May of 2021 – within 90 days (and also in December of 2020, before work was completed), wrote to RLB to demand payment under the REA. Diamond gave notice timely.

The district court held that even if Diamond had given notice timely, Diamond did not plead that it had given notice timely. The 90-day timeline is not jurisdictional. See *U.S. ex rel. Liberty Mechanical Serv's v. NASIC*, 2 F.Supp.3d 610 (E.D. Pa. 2014) (finding the Miller Act's time requirements are nonjurisdictional and reviewing case law in depth.) Therefore, the facts should govern, and Diamond has more than complied with its notice-pleading obligations. *Anderson v. U.S. Dept. of Housing and Urban Dev.*, 554 F.3d 525, 529 (5th Cir. 2018), citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Diamond's Miller Act claim should survive.

## CONCLUSION

For the foregoing reasons, the district court's judgment dismissing Diamond's

claims for want of damages should be reversed.

SUBMITTED BY:
S/Harry E. Morse
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

## CERTIFICATE OF SERVICE

I certify that on April 21, 2023, the foregoing document was forwarded served via the Court's Cm/ECF Document Filing System, to all counsel.

S/Harry E. Morse

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 7,520 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in Times New Roman 14.

S/Harry E. Morse