# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2024

Lyle W. Cayce
Clerk

No. 23-40137

---

Diamond Services Corporation,

*Plaintiff—Appellant,*

*versus*

RLB Contracting, Incorporated; Harbor Dredging,
Incorporated; Travelers Casualty and Surety Company
of America,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:21-CV-253

---

Before Graves, Higginson, and Ho, *Circuit Judges.*

Stephen A. Higginson, *Circuit Judge*:

This interlocutory appeal concerns a dispute between, on one side, a sub-subcontractor, and on the other, a contractor, subcontractor, and insurance company, over a contract for pipeline dredging in the Houston Ship Channel. We AFFIRM in part and DISMISS in part.

## I.

We set forth below the factual and procedural background of this appeal.

No. 23-40137

## A.

On September 4, 2019, the U.S. Army Corps of Engineers, Galveston Division ("the Corps") awarded RLB Contracting ("RLB") a contract ("prime contract") for pipeline dredging in the Houston Ship Channel.  As required by the contract and the Miller Act, 40 U.S.C. §§ 3131 *et seq.*, RLB furnished a surety bond which it obtained from Travelers Casualty and Surety Company of America ("Travelers").  To assist it in dredging the volume called for by the Corps, RLB entered into a subcontract with Harbor Dredging ("Harbor").  Harbor, in turn, entered into a sub-subcontract with Diamond Services Corporation ("Diamond") for the dredge work.  As part of its obligations under the sub-subcontract, Diamond was "responsible for traversing the hopper barges from excavation site to the unloading site" and Diamond was required to perform, among other things, "all work necessary or incidental to complete" its work on the project.

During the performance of the project, the parties encountered "differing site conditions" in the area where Diamond's dredge was excavating material.  The unanticipated presence of tires in the channel, as well as other issues, slowed down the job considerably.  Diamond determined that it would not be able to continue the project profitably.  Agents of RLB, Harbor, and Diamond met to discuss the situation, and Diamond threatened to leave the project absent changes.

In October 2020, RLB submitted a request for equitable adjustment ("REA") of the prime contract to the Corps.  In Diamond's view, RLB and Harbor had agreed to compensate Diamond out of the REA using a measured-mile calculation, though in what proportion or for how much was left unsaid because it was, at the time, "unknowable."  As explained by the parties, a measured-mile calculation in this context involves comparing dredging costs incurred during a set period where differing site conditions

interrupted operations to dredging costs completed during the same period where differing site conditions did not interrupt operations.

Diamond, allegedly relying on these representations, continued working and increased operations, dredging twenty-four hours a day to build a favorable benchmark for its anticipated measured-mile calculations. RLB later withdrew its October 2020 REA because the Corps instructed RLB that the Corps would not entertain any future REAs for unanticipated costs not included in the initial REA, and it would require RLB to release its claims for all differing site conditions at the project.

After project completion, RLB prepared to submit a second amended REA and asked Harbor to certify and submit its total project costs, including direct costs, overhead, and profit, as well as corresponding numbers from Diamond. On March 5, 2021, Diamond executive James Furlette sent Harbor executive Roland Maturin an email stating "[t]his is where we are at." Attached to the email was a chart, with the sums "$1,530,323.09 Outstanding + 500,000.00 Extra work" scribbled by hand at the bottom. The sums totaled $2,030,323.09.

On March 30, 2021, Harbor submitted to RLB its certified total costs in the amount of $3,179,169, which included Diamond's certified total costs of $2,362,344. Using Harbor and Diamond's total certified costs submissions as subcontractor and sub-subcontractor and RLB's total certified costs, including RLB's direct costs, overhead, and profit, RLB amended and resubmitted its REA on April 6, 2021, seeking $8,867,212 for the excess costs associated with the differing site conditions. The Corps offered to negotiate a settlement. RLB asked Harbor to determine the amounts that Harbor and Diamond "would accept in satisfaction of their claims for a share of the excess costs recovered by RLB from the [Corps] in a settlement of the amended REA."

No. 23-40137

Here, the parties' accounts diverge. Harbor maintains that Diamond agreed, in subsequent conversations between Furlette and Maturin, to accept $950,000 "to resolve its claim for a share of excess costs recovered by RLB in an REA associated with the differing site condition[s]." Diamond insists that "when Harbor asked Diamond if Diamond would accept $950,000[,] Diamond responded not with 'yes' but with 'maybe': Diamond said that it could, but only if that's what the [Corps] was willing to pay. . . . Diamond was clear that its accession to this request by Harbor was conditional," and depended on how the REA was derived and what it included.

For its part, Harbor determined that it would accept $500,000 in resolution of its claims and communicated a total settlement sum of $1,450,000—including the $950,000 allegedly agreed to by Diamond—to RLB. RLB did not communicate with Diamond during the REA negotiation process.

After negotiations, the Corps and RLB reached a settlement of the amended REA in the amount of $6,000,000. RLB issued a joint check to Harbor and Diamond in the amount of $950,000, dated September 9, 2021.

One week later, Diamond filed suit against RLB, Harbor, and Travelers. Diamond invoked the district court's exclusive jurisdiction over Miller Act claims under 40 U.S.C. § 3133(b)(3) and supplemental jurisdiction under 28 U.S.C. § 1367 over the rest of its claims. In the alternative, Diamond asserted that the court had admiralty jurisdiction under 28 U.S.C. § 1333(1). Against Harbor and RLB, Diamond brought claims for breach of contract, implied contract, and quasi-contract; against RLB and Travelers, Diamond also brought Miller Act claims.

Harbor endorsed and tendered RLB's check for the full amount of $950,000 to Diamond on October 29, 2021. Diamond initially refused to

accept the check marked "FULL AND FINAL PAYMENT," but did so after RLB agreed to permit Diamond to disregard that notation.

At some point after RLB and the Corps reached a settlement, Maturin, the Harbor executive, placed a recorded phone call to Furlette, the Diamond executive, and remarked that he "got a call from [RLB executive] Randy [Boyd] saying that you're not going to sign the agreement that we had for the $950,000." Furlette replied that he would ask Diamond executive Stephen Swiber about it. Later in the conversation, when Maturin brought up the issue again, Furlette responded by inquiring, "950 still good?"

RLB and Travelers filed motions to dismiss. Diamond filed its first amended complaint ("FAC"), repleading its original complaint in full but "designat[ing] this as an admiralty claim within the meaning of Fed. R. Civ. P. 9(h)." Harbor filed its answer to Diamond's FAC, incorporating its earlier answer and including a jury demand. RLB also filed a responsive pleading with counterclaims for certain declaratory judgments, promissory estoppel, and money had and received, and demanded a jury trial.

Harbor filed a motion for summary judgment, and RLB filed motions for summary judgment against Diamond's claims, and in support of its own counterclaims. Diamond timely responded.

## B.

On November 14, 2022, the district court issued a memorandum opinion and order granting in part and denying in part RLB's motion to dismiss and denying Travelers's motion to dismiss. The court dismissed Diamond's unjust-enrichment cause of action and Diamond's express contractual claims against RLB, including Diamond's tug-expenses claim, but preserved Diamond's claim for equitable-adjustment expenses under a theory of quantum meruit. The court denied Travelers's motion to dismiss Diamond's Miller Act claims but ordered Diamond to file an amended

complaint within fourteen days incorporating allegations that it gave proper Miller Act notice under 40 U.S.C. § 3133(b)(2).

However, this deadline passed without Diamond filing an amended complaint. On December 5, 2022, Travelers filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The next day—eight days after the deadline set by the district court's November 14 order—Diamond filed its untimely second amended complaint ("SAC"), which Travelers and RLB moved to strike.

On December 27, 2022, Harbor filed a motion withdrawing its previous demand for a jury trial and consenting to a bench trial. RLB followed suit the next day, and Diamond filed an answer to RLB's counterclaims. Diamond filed a second answer to RLB's counterclaims on January 3, 2023. In its second answer, Diamond demanded a jury trial for the first time since filing this action. That same day, Diamond also filed a notice seeking to withdraw its Rule 9(h) designation. RLB, Harbor, and Travelers responded by filing a joint motion to strike Diamond's notice of withdrawal and demand for a jury trial. Diamond timely responded, and the defendants filed a reply.

On February 14, 2023, the district court granted Harbor's motion for summary judgment, granted RLB's motion for summary judgment against Diamond's claims, granted in part and denied in part RLB's motion for summary judgment on its counterclaims, granted Travelers's and RLB's motions to strike Diamond's untimely SAC, and denied Travelers's motion for judgment on the pleadings as moot. In a separate order also issued that day, the district court granted the joint motion to strike Diamond's demand for a jury trial. In that order, the district court addressed its jurisdiction over the case for the first (and only) time, indicating that it retained jurisdiction under § 1333 based on Diamond's "admiralty-claim designation."

No. 23-40137

Together, these February 2023 orders disposed of all of Diamond's remaining claims against Harbor, RLB, and Travelers that had not been dismissed by the November 2022 order, leaving only RLB's counterclaims.

Diamond timely filed its notice of appeal, stating that it sought to appeal "from the [c]ourt's [o]rder dated February 14, 2023, dismissing Diamond's claims against RLB, against Travelers, and against Harbor Dredging with prejudice, as well as all other orders, rulings and decrees leading up to and related to that judgment that are adverse to Diamond Services Corporation, under 28 U.S.C. [§ ]1292(a)(3)."

## II.

We review a summary judgment de novo, "applying the same standard on appeal that is applied by the district court." *Landmark Am. Ins. Co. v. SCD Mem'l Place II, LLC*, 25 F.4th 283, 285 (5th Cir. 2022) (citation omitted). "[T]he scope of appellate review on a summary judgment order is limited to matters presented to the district court" and, "[i]f a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005) (internal quotation marks and citation omitted).

Under Texas law, which governs Diamond's state-law claims, "[t]he question of whether an express contract covers the services at issue is a legal question reviewed de novo." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 737 (Tex. 2018).

## III.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(a), and "[w]e may affirm a summary judgment on any

No. 23-40137

ground supported by the record, even if it is different from that relied on by the district court," *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021) (citation omitted).

We first consider whether the district court erred in granting RLB's motion for summary judgment against Diamond's claims. For the reasons enumerated below, it did not.

### A.

On appeal, Diamond attempts to challenge the district court's order dismissing Diamond's claim against RLB for expenses incurred from contracting with the tug M/V MISS KERRILYNN to transport Diamond's barges. RLB contends that we lack jurisdiction over Diamond's tug-expenses claim because Diamond's appeal of the November 2022 order was untimely. RLB is correct.

"[N]o appeal shall bring any judgment, order or decree in an action, suit or proceeding of a civil nature before a court of appeals for review unless notice of appeal is filed, within thirty days after the entry of such judgment, order or decree." 28 U.S.C. § 2107(a); *see* Fed. R. App. P. 4(a)(1)(A). The same is true for admiralty cases, including interlocutory appeals. *See Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988) ("Under Rule 4(a)(1), parties appealing interlocutory maritime decrees have 30 days to file their notices of appeal."). "The filing of a timely notice of appeal, within thirty days after entry of the court's judgment, is mandatory and jurisdictional." *Kinsley v. Lakeview Reg'l Med. Ctr. LLC*, 570 F.3d 586, 588 (5th Cir. 2009).

The November 2022 order dismissed Diamond's tug-expenses claim against RLB. The deadline for appealing that ruling on an interlocutory basis was December 14, 2022. *See* 28 U.S.C. § 2107(a). However, Diamond did not file its notice of appeal until February 28, 2023—seventy-six days after

the interlocutory-appeal deadline. The notice of appeal did not expressly mention the November 2022 order or the tug-expenses claim, but stated that Diamond sought to appeal "all other orders, rulings and decrees leading up to and related to that [February 2023] judgment that are adverse to Diamond." Accordingly, because Diamond's interlocutory appeal of the November 2022 order dismissing Diamond's tug-expenses claim was untimely, we lack jurisdiction to consider the claim and must therefore dismiss it.[1] *See Kinsley*, 570 F.3d at 588.

## B.

Before considering the merits of the rest of Diamond's claims, we must examine the basis of our jurisdiction over them. *Hill v. City of Seven Points*, 230 F.3d 167, 169 (5th Cir. 2000). Section 1292(a)(3) provides appellate jurisdiction over "appeals from . . . [i]nterlocutory decrees of . . . district courts . . . determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3). Accordingly, § 1292(a)(3) contains three prerequisites:

> (1) the underlying case must be an admiralty case "in which appeals from final decrees are allowed";
> (2) the appeal must be from an interlocutory order or decree of the district court; and
> (3) the order or decree must have determined "the rights and liabilities of the parties."

---

[1] To the extent that Diamond seeks to recover from Harbor, in addition to RLB, on its tug-expenses claim, we lack jurisdiction over that claim for the same reason. We note that dismissal for lack of subject-matter jurisdiction here is without prejudice; nothing would prevent Diamond from appealing the claims dismissed by the November 2022 order once final judgment is entered below. *See, e.g.*, *Farbwerke Hoeschst A.G. v. M/V "Don Nicky*,*"* 589 F.2d 795, 797 (5th Cir. 1979) ("[A]n appellant does not compromise its rights to review of interlocutory orders by waiting for a final judgment.").

No. 23-40137

*Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 663 (7th Cir. 1998) (citation omitted). For the reasons below, we conclude that all three requirements have been met and we therefore have jurisdiction over Diamond's appeal of its remaining claims.

1.

RLB contends that Diamond's claims on appeal do not comprise "an admiralty case" because "Diamond's only potentially appealable claims are its claims for additional proceeds of the [a]mended REA based on quantum meruit and its Miller Act claims," which "do not give rise to admiralty jurisdiction."

First, we must look to the substance of the contract between Diamond and Harbor. Federal admiralty jurisdiction over a contract claim "'depends upon . . . the nature and character of the contract,' and the true criterion is whether [the contract] has 'reference to maritime service or maritime transactions.'" *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004) (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). A contract is subject to admiralty jurisdiction when "the principal objective of a contract is maritime commerce." *Id.* at 25. We have noted that "[t]here are many cases holding that a dredge, or a barge with a pile driver, employed on navigable waters, is subject to maritime jurisdiction." *In re V-14813*, 65 F.2d 789, 790 (5th Cir. 1933). Additionally, "[a] charter party is a classic example of a maritime contract." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986). Other circuits have held that "[d]redging a navigable waterway is traditionally a maritime activity, and such a dredging contract facilitates maritime commerce, which anchors maritime jurisdiction." *J-Way S., Inc. v. U.S. Army Corps of Eng'rs*, 34 F.4th 40, 45 (1st Cir. 2022); *see Misener Marine Constr., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 837 (11th Cir. 2010).

No. 23-40137

Although the contract between Harbor and Diamond did not involve a "charter party"—i.e., "a document recording an agreement between a ship owner and someone who rents all or part of the ship for a particular voyage or period of time,"[2]—the contract centered on maritime commerce. As in *Misener*, here, "[t]he primary objective of the contract between [Diamond] and [Harbor] was dredging a navigable waterway in a port that services international and national commerce." 594 F.3d at 837. And "[t]here is no doubt that the work contracted for and performed by [Diamond] had a direct effect on maritime services and commerce." *Id.*

Next, this court looks to Diamond's pleadings. Federal district courts have original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). Under Federal Rule of Civil Procedure 9(h), "[a] case that includes an admiralty or maritime claim . . . is an admiralty case within 28 U.S.C. § 1292(a)." Fed. R. Civ. P. 9(h)(2). Moreover, "in this circuit a plaintiff who asserts admiralty jurisdiction as a basis for the court's subject matter jurisdiction over a claim has automatically elected under Rule 9(h) to proceed under the admiralty rules, even if she states that her claim is also cognizable under diversity or some other basis of federal subject matter jurisdiction." *Luera v. M/V Alberta*, 635 F.3d 181, 189 (5th Cir. 2011). Because "[t]here is no right to a jury trial where the complaint contains a statement identifying the claim as an admiralty or maritime claim," *T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 587 (5th Cir. 1983), a plaintiff's decision not to request a jury trial further supports an inference that the plaintiff intended to invoke

---

[2]    *Charter Party*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/charter-party [https://perma.cc/T37F-79U9].

No. 23-40137

admiralty jurisdiction, *see Noble Drilling, Inc. v. Davis*, 64 F.3d 191, 194-95 (5th Cir. 1995).

Here, Diamond's FAC "designate[d]" its action as a maritime claim by expressly invoking Rule 9(h), and it did not request a jury trial. Although Diamond later requested a jury trial more than fifteen months after it filed its complaint, the district court properly rejected Diamond's request because the case's admiralty-jurisdiction designation, which forecloses a jury trial, remained in Diamond's pleadings. *See T.N.T. Marine*, 702 F.2d at 588. And even after the district court dismissed Diamond's contractual and tug-expenses claims, the court continued to treat Diamond's remaining claims as maritime claims, based on Diamond's controlling FAC, in the court's order granting the joint motion to strike Diamond's demand for a jury trial. Together, Diamond's pleadings and the district court's only discussion of its own jurisdiction over the case also support admiralty jurisdiction.

Still, RLB raises an unsettled question in this circuit: whether a maritime case can become unmoored from its status as a maritime case after a court dismisses a plaintiff's principal maritime claims (here, Diamond's contractual and tug-expenses claims). *Cf. Bodden v. Osgood*, 879 F.2d 184, 187 (5th Cir. 1989) (dismissing an "admiralty" claim for lack of appellate jurisdiction where it was filed in state court with a request for a jury trial).

Our case law—as well as that of the other circuits—governing the interpretation of § 1292(a)(3) is difficult to reconcile. On the one hand, we have instructed that § 1292(a)(3)'s exception to 28 U.S.C. § 1291's final-decision requirement is "construed . . . narrowly, hewing closely to the statute's original purpose of permitting appeals from orders finally determining one party's liability to another and referring the action for a computation of damages." *Nat'l Shipping Co. of Saudi Arabia v. Valero Mktg. & Supply Co.*, 963 F.3d 479, 482 (5th Cir. 2020) (internal quotation marks

and citation omitted); *see State Bank & Tr. Co. v. C & G Liftboats, L.L.C.*, 906 F.3d 361, 362 (5th Cir. 2018); *Francis ex rel. Francis v. Forest Oil Corp.*, 798 F.2d 147, 150 (5th Cir. 1986) ("Orders which do not determine parties' substantive rights or liabilities . . . are not appealable under section 1292(a)(3), even if those orders have important procedural consequences."); *Hollywood Marine, Inc. v. M/V Artie James*, 755 F.2d 414, 416 (5th Cir. 1985).

On the other hand, we have pronounced that "[t]he term 'interlocutory decrees' in section 1292(a)(3) is broadly interpreted." *Walter E. Heller & Co. v. O/S Sonny V.*, 595 F.2d 968, 971 (5th Cir. 1979); *see Aparicio v. Swan Lake*, 643 F.2d 1109, 1113 n.6 (5th Cir. Unit A Apr. 1981) ("An order that dismisses on the merits one of several separate claims for relief is appealable under Section 1292(a)(3)."); *Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 480 (5th Cir. 2014) ("As a general rule, whenever an order in an admiralty case dismisses a claim for relief on the merits it is appealable under section 1292(a)(3)." (citation omitted)).

Notwithstanding the friction in our case law, the plain language of both § 1292(a)(3) and Rule 9(h)(2) applies to admiralty *cases*, not merely admiralty claims. The notes to Rule 9 from the 1997 Advisory Committee shed further light on this textual distinction:

> The courts of appeals have not achieved full uniformity in applying the § 1292(a)(3) requirement that an order "determin[e] the rights and liabilities of the parties." It is common to assert that the statute should be construed narrowly, under the general policy that exceptions to the final judgment rule should be construed narrowly. This policy would suggest that the ambiguity should be resolved by limiting the interlocutory appeal right to orders that determine the rights and liabilities of the parties to an admiralty claim.
> *A broader view is chosen by this amendment for two reasons*. The statute applies to admiralty "cases," and may itself

No. 23-40137

provide for appeal from an order that disposes of a nonadmiralty claim that is joined in a single case with an admiralty claim. Although a rule of court may help to clarify and implement a statutory grant of jurisdiction, the line is not always clear between permissible implementation and impermissible withdrawal of jurisdiction. In addition, so long as an order truly disposes of the rights and liabilities of the parties within the meaning of § 1292(a)(3), it may prove important to permit appeal as to the non-admiralty claim. Disposition of the non-admiralty claim, for example, may make it unnecessary to consider the admiralty claim and have the same effect on the case and parties as disposition of the admiralty claim. Or the admiralty and nonadmiralty claims may be interdependent. . . . [S]o long as the case involves an admiralty claim and an order otherwise meets statutory requirements, the opportunity to appeal should not turn on the circumstance that the order does—or does not—dispose of an admiralty claim. . . .

Fᴇᴅ. R. Cɪᴠ. P. 9(h) note on 1997 Amendment (emphasis added).

There is no doubt that Diamond could have appealed on an interlocutory basis from the district court's order dismissing its contractual and tug-expenses claims. *See Celtic Marine*, 760 F.3d at 480. Of course, Diamond failed to timely appeal that order. Still, in light of (i) Rule 9(h)'s plain text and broad purpose; (ii) the district court's construction of Diamond's remaining claims as maritime claims even after it dismissed Diamond's contractual and tug-expenses claims; and (iii) the fact that Diamond's remaining claims still arise from the underlying work it performed (i.e., dredging a navigable waterway), we construe Diamond's remaining claims as comprising a maritime case properly subject to interlocutory appeal under 28 U.S.C. § 1292(a).

No. 23-40137

**2.**

Because we "have already determined that the order[] at issue [was] not [a] final order[], [it] must be interlocutory" and therefore satisfies the second prerequisite. *Wingerter*, 185 F.3d at 668 (internal citation omitted).

**3.**

Finally, "[w]e have jurisdiction to review [an] interlocutory appeal under 28 U.S.C. § 1292(a)(3)" from a summary judgment because "the district court's grant of summary judgment determine[s] the rights and liabilities of parties in an admiralty case." *Cent. Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320, 322 n.2 (5th Cir. 2022).

Because Diamond appeals from a summary judgment against it, the appeal satisfies § 1292(a)(3)'s requirement that the interlocutory decree "determin[e] the rights and liabilities of the parties." Thus, this appeal fulfills the third prerequisite.

\*    \*    \*

Because this case meets all three of § 1292(a)(3)'s prerequisites, we have jurisdiction under § 1292(a)(3) over this interlocutory appeal.

**C.**

Turning to the merits of RLB's motion for summary judgment against Diamond's claims, the district court did not err in concluding that Diamond failed to raise a fact issue as to whether it is entitled to quantum meruit damages because (a) the express sub-subcontract covers the damages that Diamond alleges under quantum meruit, and (b) Diamond did not introduce evidence concerning the reasonable value of the work it performed or the materials it furnished for which it has not already been compensated.

"Quantum meruit is an equitable theory which permits a 'right to recover . . . based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 462 (5th Cir. 2003) (quoting *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex. 1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989)). Under Texas law, recovery is limited to situations in which "non payment for the services rendered would result in an unjust enrichment to the party benefited by the work." *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) (internal quotation marks and citation omitted).

"Recovery on an express contract and on quantum meruit are inconsistent." *Woodard v. Sw. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964). If the work for which recovery is sought is covered by and falls within the scope of an express contract, the party seeking to recover damages "must look to the contract[] for compensation." *Black Lake*, 538 S.W.2d at 86. This express-contract bar "applies not only when the plaintiff seeks to recover in quantum meruit from the party with whom [it] expressly contracted, but also when the plaintiff seeks recovery from a third party foreign to the original contract but who benefitted from its performance." *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724 (Tex. App. 2011).

However, "the existence of an express contract does not preclude recovery in [q]uantum meruit for the reasonable value of services rendered and [materials supplied] which are not covered by the contract." *Black Lake*, 538 S.W.2d at 86. Accordingly, a party seeking recovery in quantum meruit must "introduce evidence on . . . the reasonable value of work performed and the materials furnished." *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 625 (Tex. App. 1987); *see Hill*, 544 S.W.3d at 733; *Air Conditioning, Inc. v. L.E. Travis & Sons, Inc.*, 578 S.W.2d 554, 556 (Tex. Civ. App. 1979) ("A claim in [q]uantum meruit does not proceed upon the

contract for the contract price, but proceeds independently of the contract to recover the value of the services rendered or materials furnished.").

**1.**

As an initial matter, RLB contends that Diamond waived any arguments in support of its quantum meruit claims by failing to raise them below. That is incorrect.

Our review of a summary judgment is "limited to matters presented to the district court." *Keelan*, 407 F.3d at 339. "If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be . . . raised [for the first time] on appeal." *Id.* (citation omitted). Federal Rule of Civil Procedure 56 permits a court to consider other materials in the record, but a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). Under Rule 56 it is not the trial court's obligation to sift through the record in search of evidence to support a party's claims; instead, it is the party's burden to "identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence supported [its] claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992)).

RLB argues that "Diamond did not even mention the term quantum meruit anywhere in its response to RLB's motions for summary judgment, let alone [its] alleged damages" under a theory of quantum meruit. Although RLB is correct that Diamond did not specifically invoke the term "quantum meruit" in its response to RLB's motions for summary judgment, Diamond did argue that it "should recover on a quasi-contractual basis" due to "differing site condition[s] . . . outside the contract." Diamond's briefing at summary judgment on this issue sufficed to "present[] [the matter] to the district court." *Keelan*, 407 F.3d at 339.

No. 23-40137

**2.**

At the summary-judgment stage, RLB challenged Diamond's quantum meruit claims against RLB for additional proceeds of the REA settlement on two grounds: first, because the sub-subcontract between Harbor and Diamond covered the subject matter underpinning Diamond's quantum meruit claims; and second, because Diamond failed to submit any evidence that RLB was unjustly enriched, or the amount of any such unjust enrichment, to support its quantum meruit claims. The district court rested its summary judgment on RLB's second assertion and concluded that "[i]n response to RLB's motion for summary judgment, Diamond has not produced evidence demonstrating what the reasonable value of the work it performed or the services it rendered, for which it has not already been paid."

On appeal, Diamond argues that the "underlying contract" and prior alleged "ratio of the contract price" (54.16%) constitute evidence of the reasonable value of its work for purposes of its alleged quantum meruit damages arising from the REA. But Diamond's arguments fail to create a fact issue for the two reasons that RLB identified.

**a.**

Diamond's reliance on the "contract price" and "underlying contract" to show its alleged damages dooms its quantum meruit claims under Texas law because quantum meruit claims "do[] not proceed upon the contract for the contract price, but [must] proceed independently of the contract to recover the value of the services rendered or materials furnished." *Air Conditioning*, 578 S.W.2d at 556. Because the express sub-subcontract covers the damages that Diamond alleges under quantum meruit, Diamond's quantum meruit claims are foreclosed.

Accordingly, although the district court did not address this argument in its February 2023 order, it is an additional ground on which we affirm the

No. 23-40137

district court's grant of summary judgment against Diamond. *See Campos*, 10 F.4th at 520.

### b.

To survive RLB's motion for summary judgment, Diamond was required to introduce evidence as to the reasonable value of the work it performed or the materials it furnished for which it has not already been compensated. *M.J. Sheridan*, 731 S.W.2d at 624-25. The district court did not err in concluding that Diamond failed to do so.

Diamond failed to present any meaningful evidence on the amount of expenses it incurred for the work it performed, for which it has not already been paid, to support its quantum meruit claims. Beyond its improper reliance on the "underlying contract," Diamond points to two other sources of evidence that purportedly support its claims to quantum meruit damages. First, Diamond contends that RLB executive Boyd "testified that when a contractor receives an REA, it owes others on the job their fair share of that REA," and that Boyd conceded that "the delay affected everyone the same amount." Diamond cites no record support for these claims. Regardless, Boyd's testimony does nothing to aid Diamond in demonstrating the reasonable value of the work caused by this delay.

Second, Diamond points to Harbor executive Maturin's testimony that "he did not know how the REA should be split" and his alleged admission "that Diamond was owed out of the REA." Again, Diamond provides no record citations to support its claim that Maturin admitted that Diamond was owed a share of the REA. So, Maturin's testimony sheds no light on the reasonable value of the work Diamond performed entitling it to quantum meruit damages.

Instead, the record shows that Diamond was compensated in full for its costs and expenses, including overhead, and also profited on the project

as a result of the payments made under the sub-subcontract and the $950,000 joint check that Diamond accepted for its claims to the proceeds of the REA settlement. Diamond does not dispute these facts, which contravene Diamond's arguments on appeal that RLB was "unjustly enriched" and "ke[pt] all the money" from the REA settlement.

Moreover, the record shows that Diamond executive Furlette's email to Maturin included a notation of $500,000 as the amount Diamond was owed for "extra work." In response, Diamond presented testimony from Furlette stating that he had "no idea" what that number represented, while acknowledging it could have represented Diamond's outstanding costs related to differing site conditions or "the entirety of the extra work" completed by Diamond on the project. Additionally, Diamond executive Swiber testified that the $950,000 Diamond received from RLB exceeded the combined total of Diamond's "extra work" and the cost of the tug. The Diamond executives' testimony thus fails to create a fact issue as to whether Diamond identified the reasonable value of the work it performed or the services it rendered for which it has not already been paid. And although Diamond points to its complaint for the claim that the measure of its quantum meruit damages is "in no event less than 54% of the REA," Diamond does not present evidence that this figure bears a resemblance to the reasonable value of the work it performed or the services it rendered. Accordingly, the district court did not err in concluding that RLB is entitled to summary judgment against Diamond's quantum meruit claims.

## D.

Lastly, the district court did not err in granting summary judgment against Diamond on its Miller Act claim because the damages it seeks "fall[] outside both the letter and the spirit of the [Miller] Act." *United States ex*

No. 23-40137

*rel. T.M.S. Mech. Contractors, Inc. v. Millers Mutual Fire Ins. Co.*, 942 F.2d 946, 953 (5th Cir. 1991) (citation omitted).

The Miller Act allows a subcontractor to "recover increased out-of-pocket costs for labor and materials furnished in the course of performing its subcontract caused by contractor or government delay." *Id.* at 951. Only "costs *actually expended* in furnishing the labor or material in the prosecution of the work provided for in the contract" are recoverable if there were out-of-pocket costs for delay. *Id.* at 952. Moreover, the Miller Act does not permit recovery of "*profits* on out-of-pocket expenditures attributable to delay." *Id.* at 953 (emphasis added). Claims that do not involve "actual outlay" of funds are also excluded from Miller Act recovery. *Id.*; *see also Consol. Elec. & Mech., Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 436 (8th Cir. 1999) (holding that "lost profits . . . are not within the scope of remedies provided under the Miller Act"). And "[a] subcontractor cannot recover . . . for additional or increased costs caused by its own delay." *T.M.S.*, 942 F.2d at 952 n.14.

The district court concluded that the evidence presented by Diamond in support of its Miller Act claim failed to raise a fact issue because Diamond's alleged damages are unrecoverable under the Miller Act. On appeal, Diamond forfeited any argument challenging this separate and sufficient basis for the district court's grant of summary judgment on Diamond's Miller Act claim. Accordingly, the district court did not err in holding that Diamond's Miller Act claim could not withstand summary judgment.[3] *See Oliver v. Arnold*, 3 F.4th 152, 161 (5th Cir. 2021).

---

[3] In its reply brief, Diamond affirmatively waived any challenge to the district court's order striking Diamond's SAC, so this claim has also been abandoned. *See Oliver*, 3 F.4th at 161.

No. 23-40137

## IV.

For the foregoing reasons, we AFFIRM in part as to Diamond's quantum meruit and Miller Act claims and DISMISS in part as to Diamond's untimely tug-expenses claim.